1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3    _____

4    UNITED STATES OF AMERICA,              DOCKET NO. 12-CR-081-F

5            Plaintiff,

6            vs.
                                            Cheyenne, Wyoming
7    PAUL D. CARDWELL,                      January 27, 2014
                                            9:00 a.m.
8            Defendant.

9

10   _____

                  TRANSCRIPT OF SENTENCING PROCEEDINGS
11
              BEFORE THE HONORABLE NANCY D. FREUDENTHAL
12                CHIEF UNITED STATES DISTRICT JUDGE

13   APPEARANCES:
     For the Plaintiff:       LISA E. LESCHUCK
14                            Assistant United States Attorney
                             UNITED STATES ATTORNEY'S OFFICE
15                            2120 Capitol Avenue
                             P.O. Box 668
16                            Cheyenne, WY 82003-0668

17   For the Defendant:       JAMES H. VOYLES
                             VOYLES ZAHN PAUL
18                            141 East Washington Street
                             Suite 300
19                            Indianapolis, IN  46204

20

21
     Court Reporter:          Janet Davis, RDR, FCRR
22                            United States Court Reporter
                             2120 Capitol Avenue, Room 2228
23                            Cheyenne, WY  82001
                             (307)635-3884/jbd.davis@gmail.com
24

     Proceedings recorded by digital stenography, transcript
25   produced with computer.

1                          I N D E X

2

OBJECTIONS TO PRESENTENCE REPORT                    PAGE

3

        Mr. Voyles                                      3
4       Ms. Leschuck                                    3
        The Court                                       4
5       Mr. Voyles                                      6
        Ms. Leschuck                                    6

6

7

JUDGMENT AND SENTENCE                               PAGE
8
ARGUMENT ON DISPOSITION
9    Mr. Voyles                                        12
     Ms. Leschuck                                      48
10   VICTIM IMPACT STATEMENTS
     Mr. Patten                                        18
11   Mr. Copenhaver                                    27
     Mr. Todhunter                                     38
12   Mr. Richardson                                    44
     ALLOCUTION
13   The Defendant                                     50
     JUDGMENT & SENTENCE
14   The Court                                         54

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings commenced 9:00 a.m., January 27, 2014.)

2               THE CLERK:  In criminal matters Case Nos. 12-CR-81-2-F

3    and 13-CR-254-1-F, United States of America versus Paul D.

4    Cardwell, set today for sentencing.

5         Counsel, please state your appearances.

6               MS. LESCHUCK:  Lisa Leschuck on behalf of the United

7    States.

8               MR. VOYLES:  James H. Voyles on behalf of Paul

9    Cardwell.

10              THE COURT:  Good morning.

11              MR. VOYLES:  Good morning, Your Honor.

12              THE COURT:  Mr. Voyles, have you had an opportunity to

13   read and discuss the second revision to the Presentence

14   Investigation Report --

15              MR. VOYLES:  I have, Your Honor.

16              THE COURT:  -- with your client?

17              MR. VOYLES:  Yes, with my client.

18              THE COURT:  Good.  And are there any factual issues

19   concerning that second revision?

20              MR. VOYLES:  No, Your Honor.

21              THE COURT:  All right.  For the Government, are there

22   any factual issues concerning the second revision to the

23   Presentence Report?

24              MS. LESCHUCK:  There are not, Your Honor.

25              THE COURT:  All right.  I will accept the Presentence

1   Report as the Court's findings of fact.

2          Mr. Voyles, are there any legal issues relevant to the

3   guideline calculation that don't concern either requests for

4   departure or variance?

5          MR. VOYLES:  No, Your Honor.

6          THE COURT:  Any from the Government?

7          MS. LESCHUCK:  There are none, Your Honor.

8          THE COURT:  All right.  I will put the guideline

9   calculation on the record.  This is derived from the second

10  revised report beginning at the top of page 12.

11         We're here today for a sentencing for various

12  offenses, that being Count 1, conspiracy to commit mail and

13  wire fraud, in violation of 18 USC Section 1349; Count 2,

14  conspiracy to commit money laundering, in violation of 18 USC

15  Section 1956(h); and Count 3, conspiracy to commit mail and

16  wire fraud, in violation of 18 USC Section 1349.

17         The guideline for a violation of 18 USC Section 1956

18  offenses is found at Sentencing Guideline 2S1.1 of the

19  guideline.  The base offense level relates to the amount of

20  loss.  Because the amount of loss was between $1,000,000 and

21  $2,500,000, there are 16 levels that are added to the base

22  offense level of 7.  That base offense level is for the

23  underlying offense which is for mail fraud.

24         So 7 as a base offense level with the addition of 16

25  levels results in a level 23.

1              However, two more levels are added because the

2      defendant abused a position of trust as CEO of the hospitals

3      where the fraud schemes were perpetrated.  Therefore, we start

4      with an offense level of 25.  Again, that is derived from the

5      mail fraud base offense level of 7, the amount of loss

6      enhancement which is a 16-level enhancement and two levels

7      because of the abuse of a position of trust.

8              Then we have a one-level enhancement for the money

9      laundering offense.  The defendant was convicted of a

10     conspiracy under 18 USC Section 1956(h).  The sole object of

11     the conspiracy was to commit the offense set forth in Section

12     1957 which is mail fraud.  As a result, one level is added.

13             Two levels are added because both the mail fraud and

14     the money laundering offense involve the use of sophisticated

15     means.

16             Four levels are added because the defendant was an

17     organizer and manager within both offenses, that being mail

18     fraud and money laundering.  Both offenses involved extensive

19     planning and efforts spanning over eight years involving two

20     jurisdictions.

21             The defendant impeded justice in relation to both the

22     mail fraud and money laundering offenses by fleeing the United

23     States while he was on pretrial bond supervision to avoid

24     prosecution.

25             Therefore, after those various enhancements we are at

1    an adjusted offense level of 34.  The defendant accepted

2    responsibility, and so he receives a two-level reduction.

3           And he assisted the authorities in the investigation

4    and prosecution of his own conduct and that results in a

5    one-level reduction.  Therefore, we are at a total offense

6    level of 31.

7           To the defendant's credit, he has no countable

8    criminal convictions.  With a total offense level of 31,

9    Criminal History Category I, the guideline range is 108 to 135

10   months.

11          Any objections to the Court's recitation of the

12   guidelines?  Mr. Voyles.

13          MR. VOYLES:  On behalf of the defendant, none, Your

14   Honor.

15          THE COURT:  For the Government.

16          MS. LESCHUCK:  None, Your Honor.

17          THE COURT:  At this time I normally turn to defense

18   counsel for a statement on disposition.  However, I do want to

19   put a number of documents on the record that I have received

20   concerning this sentencing so that we can just verify that

21   everybody has the letters.  I have had an opportunity to read

22   all of these letters.  If there are letters that I don't

23   reference, please bring those to my attention.  They came in a

24   bit sporadically, and some of them, I believe, are duplicates.

25          So on behalf of the defendant I have a letter from

1  Joseph A. Rushton who was a former math instructor and football

2  and track coach and sponsor of the Fellowship of Christian

3  Athletes during the time that Mr. Cardwell was in -- at Tipton

4  High School.  He may still be -- it looks like he's still a

5  teacher, but that's how he derives his familiarity --

6  familiarity with Mr. Cardwell is that he was his math teacher,

7  football and track coach and sponsor.

8          He writes a character letter concerning his

9  experiences with Mr. Cardwell during that period of time,

10  speaking to his time as a student and athlete, his involvement

11  with student council, the fact that he was student body

12  president; he was an active member of the Fellowship of

13  Christian Athletes.  After graduation when Mr. Cardwell came

14  back to Tipton, he was a member of the community, active -- an

15  active member of the community and served on the school board.

16          Mr. Rushton comments that these positive qualities are

17  not lost to an individual, and he writes to call them to my

18  attention.

19          I also have a letter from Denny Altherr .  He was a

20  classmate and friend of Mr. Cardwell.  He has some

21  disabilities, and he speaks to his experience with Mr. Cardwell

22  as a genuine and caring individual who was there for him in

23  school when he had to endure torment and teasing.  So he writes

24  a character reference speaking of Mr. Cardwell's kind heart and

25  caring nature.

1              I have a letter from Mrs. Barbara Cardwell, the

2    defendant's mother.  She also provides some history concerning

3    Mr. Cardwell's time as a young boy, both positive and negative

4    experiences that she believes affected Mr. Cardwell.  She

5    speaks that he was a popular child and young man.  He was a

6    hard worker, working from the time he was 13 years old.  She

7    addresses his time in school and his time as CEO at White

8    County Hospital in Indiana.

9              She details a number of volunteer activities that Mr.

10   Cardwell has dedicated himself to supporting, including youth

11   football league, Goodwill, Special Olympics, Rotary and various

12   Red Cross activities concerning different weather events.

13             She addresses his time as president and member of the

14   board of directors for the Indiana Hospital Association Board

15   as well as the Indiana Healthcare Financing Board.

16             She addresses some volunteer work in Thailand, and in

17   general she provides an overview of the characterization, as

18   she puts it, of the real Paul.

19             I also have a letter from John Cardwell, the father

20   figure for Paul Cardwell.  While he admits he does not know the

21   details of the charges, the point of his letter is to explain

22   his experience with Paul.  He characterizes him as the best

23   son, and he addresses in detail his view of Paul's capacity to

24   do good.

25             I have a letter from Lisa Elaine Hobbs, Mr. Cardwell's

1   sister.  She addresses their time as a child, some of the

2   negative experiences that they both experienced during that

3   time and hopes that he receives help for some of those

4   experiences when he's in prison.  Again, it is a character

5   reference letter.

6           I have a letter from Jeanine, I believe it is, Wade or

7   Dade --

8           THE DEFENDANT:  It is Wade, Your Honor.

9           THE COURT:  Thank you.

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  -- a family friend.  She was a teacher

12   with Mrs. Cardwell, Paul's mother, and she addresses his time

13   there in Tipton and the experiences that she had with him when

14   he worked at the pool and helped her with some of her house

15   issues.

16          Let's see if I can get out of this document.

17          I have some victim letters.  I have a Victim Impact

18   Statement from the Indiana University of Health which addresses

19   their -- the effect that the criminal conduct had on that

20   institution.  In addition to monetary losses which -- most of

21   which has been recovered through insurance, they also describe

22   that the experience consumed substantial management, personnel

23   resources.  It was a distraction of the organization leadership

24   from operational issues, and it generated public interest

25   within the community and impacted the image of the institution

1    and the trust of the citizens.

2          I have a Victim Impact Statement from Powell Valley

3    Healthcare which is quite lengthy, describes the conduct as

4    devastating to the Powell community.  They not only -- are they

5    troubled by the fraud, but also the fact that they feel like

6    they paid a large sum to a CEO who was largely absent from the

7    facility.  They lost their CFO over this incident.  They

8    expended funds to investigate, and, again, they have a long

9    statement about the distraction of time and energy that this

10   caused to the board.

11         The board members also indicate that they felt like

12   they lost the faith and trust of their own community and, in

13   turn, temporarily lost faith and trust in the management

14   services firm HealthTech.

15         They discussed the facility expansion and remodeling

16   cost that was put on hold due to the serious cash flow problems

17   at the hospital.  They discussed the low morale and lack of

18   trust in the administration that this caused both within the

19   employees as well as the community, the sleepless nights and

20   the countless hours in extra meetings and time away from family

21   and children that this caused the board members, and, on top of

22   that, facing a hostile community.

23         They express concern over what they perceive was a

24   binding plea agreement -- this case does not concern a binding

25   plea agreement -- and address a number of the guideline

1    calculations, many of which have been applied in this case.

2            I have a letter from, I think it is, Mr. Richardson

3    from -- yes, Eli Richardson from the Bass, Berry and Sims Law

4    Firm addressing some of the same points in the Victim Impact

5    Statement and essentially providing a memorandum on guideline

6    calculations and how those calculations should apply in this

7    case.

8            The sense from this is that the enhancements that

9    have -- many of which have been applied should apply and that

10   the guideline range -- while I don't believe a guideline

11   range -- or a sentence is recommended in the memo, the sense is

12   that the guidelines don't adequately capture the need for

13   punishment to reflect the seriousness of the crime, to afford

14   deterrence and to protect the public.

15           I have a letter from Tracy Copenhaver on behalf of

16   Powell Valley Health which in a lengthier and with more detail

17   essentially supports the information in the victim impact

18   statement.  Again, the context of the letter assumes

19   incorrectly that there was a binding plea agreement in this

20   case.  There is not.  The focus of the letter is that had that

21   been the case, the anticipated guideline range would be

22   inadequate.

23           I don't believe Mr. Copenhaver expresses what he

24   thinks an adequate sentence would be.  Much of this letter

25   discusses applicable enhancements from Mr. Copenhaver's

1  perspective and the need for a sentence to address the --

2  either by way of departure or variance upward to address the

3  severity of the offense, the need for punishment and the need

4  for protection.

5          I apologize for my delay.  Some of this came, again,

6  in a duplicate context, so I'm just making sure I didn't miss

7  any of the letters.

8          Mr. Richardson in the packet that I received does

9  provide some supporting documentation by way of e-mails that

10  came from Mr. Cardwell, and transcripts of depositions were

11  attached as well.

12          Are there letters that have been provided to the Court

13  by way of filing in CM/ECF or provided to the probation office

14  that are not identified?

15          MR. VOYLES:  No, Your Honor.

16          THE COURT:  All right.  Thank you, Mr. Voyles.

17          MS. LESCHUCK:  None from the United States, Your

18  Honor, of which I am aware.

19          THE COURT:  All right.  Mr. Voyles, I would offer you

20  the opportunity to address the Court first on disposition.

21          MR. VOYLES:  Thank you, Your Honor.  May it please the

22  Court.

23          THE COURT:  Counsel.

24          MR. VOYLES:  Judge, I think the Court in articulating

25  the letters that we provided as part of our sentencing

1   memorandum to the Court addressed -- and my view really is,

2   Your Honor, that the probation officer, Mr. Fitzgerald, did an

3   excellent job in this particular case.  But what I tried to do

4   with the memorandums were to provide kind of an overall picture

5   of Mr. Cardwell that ultimately the Court is going to need to

6   make an ultimate decision about punishment in this particular

7   case.

8            So I thought the letters kind of painted for the Court

9   the individual before the Court ever knew him, before the Court

10  was involved in Mr. Cardwell's criminal conduct so that you had

11  some ability to maybe, in your own mind when you fashion a

12  sentence, rationalize, if you can, this dichotomy that appears

13  on the record.

14           We have a young man who was extremely successful in

15  high school, very bright, was a leader, achiever, that was

16  spoken well of by all those who have written his letters.  His

17  mother, Mrs. Cardwell, is here.  She's in the courtroom.  She

18  drove and flew from Indianapolis to be here with him.

19           And she's suffering the same kind of things that I

20  think Your Honor does.  She's embarrassed to be here.  She's

21  disappointed.  She's angry; all of the emotions that I expect a

22  mother, a parent would feel when they have to come in front of

23  a federal court to see their son or daughter sentenced on a

24  serious criminal violation.

25           The Court reflected that Mr. Cardwell has no prior

1   criminal history, which is accurate, and was someone who until

2   I met him appeared to be someone who was successful, high

3   achiever, well thought of, even in White County.  He was the

4   CEO of choice by the media and others, as the Court knows, and

5   he was someone who people could look to as a leader, who was

6   respected.

7        But yet behind that, we're seeing this conduct that

8   the Court has described and that Ms. Leschuck and I have been

9   dealing with for over a year:  Fraud, deceit, money laundering,

10  fleeing the jurisdiction, coming back only as a result of the

11  Government ultimately finding Mr. Cardwell in Thailand.

12       So trying to wrap our minds around those two different

13  people is difficult, and I recognize that.

14       I'm so glad, really.  I was standing in front of a

15  federal judge in the Southern -- Northern District of Indiana

16  on January 12th, 2005, when Booker came down, and it was an

17  interesting day.  Judge Sharp was a very learned and wonderful

18  judge in our district, and ultimately began my first experience

19  with dealing with Booker matters when we're not bound by the

20  guidelines.

21       We certainly know that judges like yourself use the

22  guidelines as a barometer in an ability to assess criminal

23  conduct, character, background, criminal history in order to

24  try to find a proper means, a balancing as between these and

25  what we feel and see as an opportunity for the Court.

1          Because I grew up in the -- in both systems.  I

2   certainly grew up prior to the guidelines, and I've certainly

3   lived with the guidelines.  I feel like I'm kind of back in my

4   childhood now when the guidelines are advisory only.

5          So we use the 3553 to give what I call judicial

6   discretion back to the Court.  And those factors that we look

7   at are certainly factors that we have to consider, the nature

8   and history of the offense, the characteristics of the

9   defendant.  Well, we certainly have a series of criminal

10  conduct that are very difficult.  He's accepted responsibility

11  for them, but this doesn't lessen the fact that those were

12  crimes that Mr. Cardwell committed.

13         We reflect on whether or not the general public in

14  looking at this sentence that the Court will ultimately impose

15  in this case will be able to feel that justice was done

16  properly in this case.

17         To protect the public from further criminal conduct

18  from people who see what sentence that Mr. Cardwell receives in

19  this particular case.

20         Provide the defendants with needed evaluation,

21  rehabilitation; well, I'm not sure that's really a factor in

22  this case.  It is not someone who comes before the Court that

23  is significantly in need of education or medical treatment, but

24  he certainly is someone who has got to reflect on his own

25  conduct.

DOCKET NO. 12-CR-081-F        ARGUMENT - VOYLES

1            And the rehabilitation, Your Honor, I think has

2    started when he was arrested.  The attitude of the man that I

3    saw in my den when he first came to my house and was brought by

4    another lawyer friend of mine who was his prior counsel is

5    certainly a different man than I see today.  And I've said that

6    to him.  I've said that to his mother.  And I've said that to

7    the Government.  I think he's made an effort to accept the

8    total responsibility for his conduct.  He's going to exercise

9    the right of allocution in this case for you.

10           I know that there is a sentence that previously had

11   been imposed in this court on the codefendant, Mr. Plake, and I

12   know that his sentence was approximately 30 months.  We now

13   have a guideline calculation in our case that would put us

14   between 108 and 135 months.

15           So I know when you look at the 3553 factors, they're

16   also considering to avoid unwarranted sentence disparity

17   between defendants who have committed like criminal conduct.

18   Now I certainly know that Mr. Cardwell had some other factors,

19   clearly obstruction.  Clearly the Government believed that he

20   was the leader and that was where the four points -- and we

21   filed an objection, but the Court has accepted the four points

22   instead of the two increase in that capacity.

23           But when you -- when you say 30 months instead of the

24   108, I think that there should be some balancing from the top

25   end down in order to appropriately hand Mr. Cardwell an

1  appropriate sentence in this case.  Ms. Leschuck will talk

2  about the fact that there is a 5K1 not to be addressed today,

3  but that that is going to be made part of the record and will

4  be dealt with at a later time.

5        So I would respectfully urge the Court to consider a

6  departure based upon 3553 factors to in the range of 27, 26

7  guideline calculation in order for Mr. Cardwell's sentence to

8  be at least in parity with the sentence imposed on Mr. Plake.

9  The 27 is a 70 to 87 months; the 26 is a 63 to 78 month

10  imposition of the sentence.

11        Your Honor, I think that those factors, the factors

12  the Court has previously addressed and letters that have been

13  written on behalf of Mr. Cardwell, the fact that Mr. Cardwell

14  has accepted full and complete responsibility for his conduct.

15  And I would urge the Court to listen carefully, and I know the

16  Court will, in Mr. Cardwell's allocution to this Court.  Thank

17  you.

18        THE COURT:  Thank you very much, Mr. Voyles.

19        THE COURT:  Ms. Leschuck.

20        MS. LESCHUCK:  Your Honor, would it be appropriate at

21  this time, there are certain victims that would like to speak

22  on behalf of their respective employers and if this is the

23  time.

24        THE COURT:  That would be fine.

25        MS. LESCHUCK:  The United States would like the Court

1    to recognize Mr. Bill Patten.  He's currently the CEO of Powell

2    Valley.

3              THE COURT:  Mr. Patten, please step forward.  Good

4    morning, sir.

5              MR. PATTEN:  Good morning, Your Honor.

6              THE COURT:  If I could ask you to please state and

7    spell your name.

8              MR. PATTEN:  My name is William Davis Patten,

9    P-A-T-T-E-N Junior.  Thank you for the opportunity to speak on

10   behalf of Powell Valley Healthcare.  I would like to introduce,

11   if I may, three members of the Powell Valley team that will not

12   be speaking today.  With me are Dr. Valerie Langfelder.

13   Dr. Langfelder is chief of our medical staff, and she sits on

14   the Powell Valley board of directors.

15             Cheri Benander is the vice-president of resident care

16   services, and she also serves as our compliance officer.

17             And Mike Gilmore is the vice president of outpatient

18   services.

19             Your Honor, I have had the honor and privilege of

20   serving as the president and chief executive officer of Powell

21   Valley Healthcare since February 27, 2012.  I am employed by

22   HealthTech and serve as their representative at Powell Valley

23   Healthcare.

24             My first day on the job was the very day that the

25   newspapers publicly announced the embezzlement scheme of Paul

1    Cardwell and Michael Plake.  Quite a welcome to my new job.

2    Many have asked me if I knew all details of the embezzlement

3    scheme before I accepted the offer to work at Powell Valley.  I

4    respond by saying that I was shown the table of contents of the

5    book but not the whole story, because the whole story had not

6    yet to be written.

7            I now understand that they couldn't have given it to

8    me.  The deception that had been perpetrated against my

9    organization and my community had been promptly and thoroughly

10   investigated by Powell Valley Healthcare and HealthTech;

11   however, not all the details had been discovered and the damage

12   that the deception had caused, though obvious in some ways, was

13   not fully understood at all levels.  I would like to share

14   with you a number of specific ways in which Powell Valley

15   Healthcare and my employer HealthTech have been damaged by the

16   actions of Paul Cardwell.

17           We will start with the obvious, the financial

18   considerations.  As healthcare organizations go, Powell Valley

19   is a small facility.  We operate on razor-thin margins and live

20   or die based on our ability to leverage our limited financial

21   resources.  The diversion of almost $850,000 created numerous

22   financial challenges for our organization, some of which we

23   actually are still struggling to overcome.  Cash flow was the

24   most apparent.  While we actively take steps to assure that we

25   have adequate cash reserves, the impact of paying out almost

1    $850,000 in fraudulent invoices severely depleted our cash.

2    During our last fiscal year, Your Honor, we at one point got

3    down to five days cash.  That is scary in any CEO's book.  We

4    delayed needed capital equipment purchases.  We established a

5    line of credit with our local bank, just in case we couldn't

6    pay our bills or meet our payroll obligations.

7         The cost to our healthcare organization to fill our

8    CEO vacancy or for that matter other senior leaders like CFOs

9    is very high when you consider the cost of recruitment, the

10   impact on strategy, the diversion from focus, the loss of

11   momentum and the effect it has on operations and finances.

12   Powell Valley incurred huge costs and got nothing positive.  In

13   fact, all we got was negative to show for it.

14        In addition to the financial damage, Powell Valley has

15   had to deal with leadership instability in a number of

16   different ways as a result of Mr. Cardwell's actions.

17   Mr. Cardwell's lack of direction and lack of attention to

18   issues of the organization during his short tenure still

19   adversely affect Powell Valley Healthcare.  And it is important

20   to note that Mr. Cardwell was absent during much of the time

21   that he was actually employed by my facility.

22        The damage Mr. Cardwell did to our organization goes

23   far beyond the dollars though, Your Honor.  There are a number

24   of community issues, community perceptions, if you will, that I

25   would like to highlight.  Whenever an organization suffers a

1   serious setback such as an embezzlement scheme, it is natural

2   for folks to say, "How could this have happened?  Who was

3   asleep at the switch?  Don't we hire people to make sure things

4   like this don't happen?"

5        When this scheme hit the news, the issues that were

6   raised called into question the competence of the other leaders

7   at all levels of our organization and the situation

8   unnecessarily created stress and anxiety.  Many in my community

9   openly questioned the board of trustees asking something -- how

10  something like this could have happened.  The board themselves

11  agonized over this issue.

12       Fortunately Powell Valley and HealthTech working

13  closely together were able to uncover this scheme after only

14  about six months, whereas, to my understanding, the Indiana

15  hospital didn't uncover this until our situation came to light

16  and found that theirs -- their organization had lost money over

17  a six-year period.

18       Our board had to address the obvious question of how

19  this happened, and countless hours were spent reviewing and

20  re-reviewing internal processes and controls.  The competence

21  and loyalty of the remaining administrative team was

22  questioned.  Internal strife was common and loyalties were

23  called into question.  Early in the experience the medical

24  staff was pitted against the board, and the long-standing

25  positive relationship between HealthTech and Powell Valley

1    Healthcare, a relationship that goes back to 1992, was strained

2    almost to the point of breaking.  That relationship has emerged

3    fully intact, thanks only to the good faith and diligence shown

4    by both sides and no thanks to Mr. Cardwell.

5         There are also internal conflict and unnecessary

6    distraction considerations that I would like to describe for

7    you, Your Honor.  From my first day on the job the issues

8    related to this embezzlement scheme have been an unnecessary

9    distraction.  Yes, we have had to work to repair the financial

10   impact on the organization.  I guess you might say that was the

11   easier part of the job.

12        The more difficult part and, as it has turned out, the

13   much longer process has been the work we continue to do to

14   repair and restore trusting relationships.  We have spent much

15   time providing documentation and explanations regarding this

16   incident, and we have had to deal with the constant barrage of

17   front page above-the-fold stories.  We were stuck in quicksand

18   and could not move past the pain of this scheme and its impact

19   on our organization.  In fact, as I prepared to come down here

20   today I can't tell you how many people said, "So when is this

21   ever going to end?"

22        The front page nature of this story has affected our

23   ability to recruit especially medical staff, administrative

24   leaders and department heads.  Anyone who Googles our

25   organization will find one of the first things this issue, so

1    we have had to repeatedly tell and explain the embezzlement

2    story.  We have had to reassure potential candidates that our

3    organization is, in fact, well managed and that it does remain

4    financially viable.  And that was just with the ones that

5    called us.  We can only wonder how many qualified potential

6    candidates never even gave us a call because of the negative

7    publicity that we have suffered.

8         Morale at my organization became very low, and

9    employees were concerned about their jobs.  In fact, early in

10   my tenure we performed a reduction in force, one of those

11   things that you don't like to do, but when the numbers get very

12   tight you have no other choice.

13        Board members have seriously considered resigning from

14   the board as a result of this situation.  They have questioned

15   whether they have let the organization down.  They have

16   agonized over their role in how this could have been allowed to

17   happen.  Board members themselves have devoted countless

18   hours -- and, remember, this is a volunteer board.  They are

19   not compensated in any way -- dealing with the issues resulting

20   from Mr. Cardwell's actions.

21        These situations have resulted in extreme stress, many

22   extra meetings and time away from their families.  The PVHC

23   board has been rewarded for the many hours of service by

24   encounters with hostile community members who are angry over

25   the loss created by Mr. Cardwell.

1        Mr. Cardwell made a large pledge to our foundation,

2   but nothing was actually donated.  He bought a lavish house,

3   but reneged on that deal.  He even told folks he assisted with

4   surgery on Peyton Manning and that he was a decorated Navy

5   Seal.  While entertaining stories, the repeated lies and

6   misrepresentations have damaged the credibility of my

7   organization.

8        Your Honor, from what I have been told, Mr. Cardwell

9   lied about everything.  No one ever saw his wife in Powell,

10  even though he repeatedly insisted she was there and we have

11  since learned that she never was.  In fact, he went so far as

12  to tell his folks that his wife climbed -- it is called Heart

13  Mountain.  It is a famous landmark in our valley.  And to make

14  the story even better, she climbed it in flip-flops.  This is a

15  7.5 mile round trip hike with an elevation gain of 2,560

16  vertical feet.

17       Mr. Cardwell repeatedly told Powell Valley Healthcare

18  and HealthTech personnel that his wife had a mental illness.

19  While Powell Valley and HealthTech personnel responded with

20  patience, understanding, sympathy and even prayers, he repaid

21  them with still more lies, stating his need to stay in Indiana

22  to care for his wife, when in actuality he was in Thailand with

23  another woman.

24       I have never heard a statement of regret that has been

25  issued by Mr. Cardwell.  To my knowledge he has not apologized

1    and has not asked for forgiveness from the leadership team, the

2    people he worked most closely with, the people he betrayed, two

3    of whom are with me here today.  He has not apologized or asked

4    for forgiveness from the community that he betrayed, and he has

5    not apologized or expressed any sense of remorse to the

6    employer that he betrayed, nor to my knowledge has he offered

7    any form of restitution.

8          Your Honor, I would also like to share the personal

9    impact Mr. Cardwell's actions have had on me and my career.  My

10   relationship with the board of Powell Valley Healthcare was

11   seriously affected by this embezzlement scheme.  Any new CEO

12   has to prove themself.  They must develop a trusting

13   relationship with their new board.  In my career I have had

14   this getting-to-know-you experience three different times

15   before I moved to Powell.

16         I can assure you that my first year in Powell has been

17   anything but normal.  The board has been far more cautious.

18   They do not want to get burned again and they have repeatedly

19   made statements to the effect of, "Bill, this isn't about you,"

20   but when the decision-making process is affected and you're the

21   leader, it feels like it is about you.

22         The board's decision-making process itself has become

23   more conservative, and their approach to policy development is

24   far more hands on than it should be for most boards.  This is

25   an understandable reaction to the recent experience but has

1   still made the decision-making process much more complicated,

2   and therefore, much more slow than it would have been had Paul

3   Cardwell not committed these crimes.

4          Even my relationship with local legal counsel has been

5   strained.  I'm a HealthTech employee, and they understandably

6   question my loyalties and have been reluctant to include me in

7   certain discussions in which a CEO would normally be included.

8   I am proud and gratified to see how in the end counsel for

9   Powell Valley were able to work productively together with me

10  and counsel for HealthTech, but I can tell you it was not easy.

11         One additional comment I would like to make, Your

12  Honor.  There was mention of no previous criminal convictions.

13  That's just a matter of luck.  There should have been.  When

14  you look at the sequence of time, there should have been a

15  conviction on the books before our issue ever came to light.

16         Finally, the long-standing positive and trusting

17  relationship between HealthTech and Powell Valley Healthcare

18  was strained almost to the breaking point.  This strained

19  relationship could directly have affected my employment and my

20  career.  If the contract with HealthTech goes away, I'm not

21  allowed to be employed by the organization.  And so if they get

22  divorced, I'm a child that no longer has a parent, if you will.

23         The evidence is clear, Your Honor.  We have learned

24  that the embezzlement scheme in Powell was not the first scam

25  perpetrated by Mr. Cardwell and Mr. Plake.  They were

DOCKET NO. 12-CR-081-F    VICTIM IMPACT - PATTEN

1    successful defrauding my organization because they had

2    perfected their scheme in Indiana.  What took six years there

3    took less than six in Powell.  Mr. Cardwell was clearly the

4    instigator and the mastermind behind both schemes.

5            Your Honor, I believe it is impossible for

6    Mr. Cardwell to repair or make restitution for all the damage

7    he has done to my organization.  He should never be allowed to

8    serve in a position of trust again.  He should be excluded from

9    participation in the Medicare and Medicaid programs, and he

10   should serve the longest sentence the law will allow.  And in

11   my opinion, Your Honor, that still will not be long enough for

12   justice to have been served.

13           Thank you for the opportunity to offer my thoughts.

14           THE COURT:  Thank you, Mr. Patten.

15           MS. LESCHUCK:  Your Honor, I believe the next

16   individual to speak is Tracy Copenhaver, and he is counsel for

17   Powell Valley.

18           THE COURT:  Mr. Copenhaver, good morning.  If you

19   could state and spell your name.

20           MR. COPENHAVER:  Yes, Your Honor, thank you.  Tracy

21   Copenhaver, T-r-a-c-y C-o-p-e-n-h-a-v-e-r.  May it please the

22   Court.

23           THE COURT:  Counsel.

24           MR. COPENHAVER:  Your Honor, this has been a long

25   process.  We have spent hundreds, literally hundreds, if not

1    thousands, of hours tracking Paul Cardwell, trying to figure

2    out what happened to our institution, how this could happen,

3    did it happen and getting it in a position that we could work

4    with the FBI to actually prosecute Mr. Cardwell.

5         And as you're aware, he did to Powell Valley

6    Healthcare in approximately six months what he did at Indiana

7    at White County Memorial Hospital over a period of about six

8    years.  This is a man that has no remorse.  He's carried out

9    this scheme in Indiana over a period of years, completely

10   abusing the trust that he got in a position where people looked

11   up to him.  When he left that hospital, he had rave reviews.

12   He had conned them beyond belief.  They thought he was great,

13   without ever knowing how much money he had stolen from them.

14   We know it was over $800,000.

15        There are numerous other questionable activities that

16   we didn't investigate in Powell but we became aware of and

17   called to the attention of the folks in Indiana.  The amount

18   that we know he took is a minimum.  He took approximately

19   $850,000 from Powell.

20        You know, Your Honor, when he came to Powell he had

21   the intent of defrauding us before he ever got there.  One of

22   his first things he did when he got to Powell Valley Healthcare

23   was remove the individual that was employed to help and assist

24   with recruiting, coordinate recruiting, take him out of the

25   picture.  He said he would do it himself.  That's one of the

1   first things he did.  And the first month he was there he

2   brought up this Plake & Associates, this wonderful recruiting

3   firm that he had worked with and they were excellent and that's

4   who we were going to use.

5          Your Honor, Powell Valley Healthcare had used

6   recruiters.  Every hospital does.  We contracted with a

7   management company, HealthTech.  HealthTech does recruiting for

8   us.  That's the management firm that employed Mr. Cardwell to

9   be our CEO, and they themselves did recruiting and he didn't

10  use them.  And we hire separate recruiters.  He didn't use

11  them.  Those recruiters, if they place somebody in your

12  hospital, you pay them.  If they don't, you don't.

13         But Mr. Cardwell's idea was, I've got this recruiting

14  firm, Plake & Associates, that's so great and I want them to

15  work so hard on this, we're just going to pay them up front for

16  every search regardless of whether he ever places anybody.

17         Your Honor, there is not -- and we have reviewed

18  thousands of documents in this case.  There is not a letter,

19  there's not a brochure, there's not an e-mail, there is --

20  there is nothing that shows Plake & Associates recruited

21  anybody.  There is no person that ever was interviewed or

22  applied at our hospital that said they had been contacted by

23  Plake & Associates.  It did not happen.  It was an entity, a

24  shell company set up to facilitate a fraud.

25         When Mr. Cardwell came to Powell Valley Healthcare,

1   not long after he was there -- well, from the very beginning he

2   started his lies.  But not long after he was there, he started

3   lying about reasons why he shouldn't -- couldn't be there.  He

4   needed to go to -- I believe it was Hong Kong, China, to work

5   with the national accreditation association to accredit

6   hospitals because it was an honor for him to be a part of that

7   committee.  And Powell Valley Healthcare didn't want to get in

8   the way of that and allowed him to go.

9           That was a lie.  He went over there to be with his

10   wife or girlfriend.  I still haven't figured out whether he was

11   married over there because the luxurious golf course that he

12   played golf at all the time does a report, and they constantly

13   told us about how well Mr. Cardwell and his wife were playing

14   in the tournaments that he played in over there.  That's some

15   of the stuff we later found out.  I don't know if he conned

16   them into thinking that was his Thai wife or if he was actually

17   married over there.  But he was spending time with her.  He was

18   spending our money.

19           In addition to that, another one of his lies was that

20   he operated a charitable hospital for poorly inflicted youth

21   with HIV.  He had people at our hospital that were admiring

22   him, that were commending him on his great charitable efforts,

23   who supported him on being away from his job.  Doesn't exist.

24   Another lie, fabrication, a story where he just absolutely

25   abused people he was working with and who trusted him.

1          We eventually launched this investigation after

2     looking into -- just becoming concerned about so many things

3     that weren't adding up.  Finally we had some auditors come in

4     insisting on seeing the contracts between PVHC and Plake &

5     Associates.  Of course Mr. Cardwell told everybody, "Oh, yeah,

6     I'll get them to you."  They didn't exist.

7          A few days later he and Mr. Plake got some contracts

8     fabricated.  We tracked the e-mails where he set them up, and

9     that's where the house started to tumble down.

10          When he knew he was about to be caught, he resigned

11     and his resignation was rapidly accepted by HealthTech.  He

12     actually tried to ask the board to allow him to rescind that.

13     And I remember a meeting at which this board was at, knowing a

14     little bit about what had gone on and getting -- starting to

15     get the real picture of who Mr. Cardwell was.  And there was

16     people in that boardroom ready to lynch that board for not

17     allowing him to withdraw his resignation.  He had everybody so

18     buffaloed it was unbelievable.  He is a con man extraordinaire,

19     and you're going to see some of that today.

20          He eventually was charged with 14 counts of attempted

21     conspiracy and another count of wire fraud which has already

22     been dropped to, I believe, two and one.  Your Honor, he's been

23     before you at the change of plea hearing and changed his plea.

24     This Court set pretty straightforward conditions of bond, told

25     him what the Court required.  He walks out of the courtroom,

1    thumbs his nose at everybody -- at the victims, at the U.S.

2    Attorney's Office, at the Court -- fraudulently takes a

3    passport of someone else, uses it and flees the country.

4           For that he was rewarded with nine months at a beach

5    resort town in Thailand where he lived a life of luxury, as

6    reported by the Thai newspaper, without working.  Fortunately,

7    we had an informant that saw that that was a little weird or he

8    would still be there.  He's not here because of remorse.  He's

9    here because he got caught and that's the only reason he's here

10   or he would still be spending our money over there.

11          Despite his efforts at skipping bond, he received one

12   additional charge, and I think we pointed out he actually could

13   have been charged with three or four other things.  He wasn't.

14   He has already received leniency, we believe, Your Honor.

15          The depth of the lies he has gone to are basically

16   unbelievable.  As I mentioned, Plake & Associates was basically

17   a fictitious entity he used for a fraudulent scheme to defraud

18   us out of money.  He lied constantly about his family being in

19   town and his wife feeding the chickens and his son working at a

20   Chinese restaurant in Cody.  And the lies went on and on and

21   on.  But he was admired and he was looked up to.

22          Your Honor, you may have been provided this, but I

23   think it will only take a couple minutes and I would appreciate

24   just reading two e-mails.  And like I say, I think I can do it

25   in two minutes.  But this probably typifies Mr. Cardwell as

1    much as anything.  This is an e-mail written on August 18th,

2    2011.  It was written to several members of the medical staff,

3    it was written to two board members, and it was written to the

4    vice president of -- -I think her role was patient affairs.

5         This is what he writes:  "Obviously I would hope to

6    keep this e-mail as quiet as possible.  My wife Kim has

7    suffered from a mild mental illness for several years.  Every

8    several months when the meds are working, she decides she's

9    feeling better and no longer requires medication and treatment.

10   What follows is erratic behavior and depression.  It pains me

11   to disclose this information, but it is fairly obvious

12   something is wrong with the Cardwell family.

13        "Kim loaded up the kids -- Chelsea, Alex, Alicia and

14   Jake -- and went back to Indiana when I was overseas."

15   Remember, Judge, these folks were never in Wyoming, ever.

16   "What follows is tough talks with her to return to counseling

17   and restart the medications.  Because of the half-life of the

18   drug, it is often several days until she returns to herself."

19   The guy has quite an imagination.

20        "I love Powell and PVHC and plan on staying a long

21   time.  I would like to return to Indiana, get her straight and

22   back on the meds, and return to Powell with her, hopefully, and

23   certainly with Jake, Alex and Alicia."

24        He was in Thailand, he wasn't going home.  He wasn't

25   going to be with the family.

1        "Jake decided to go with her back to Indiana for

2   support and to take care of his little sisters.  This is not

3   new to the older kids, and I greatly appreciate their maturity

4   at 16.  While this was pointed -- painful to write, I have a

5   great family and substantial fiscal resources but mental

6   illness is a bitch.  My mom and hers is with her now until I

7   get there.  So that is the story.  I hope to return late next

8   week."

9        He throws his wife under the bus.  He throws his kids

10  under the bus.  He lies to the top management in the hospital,

11  all so he can be in Thailand with his girlfriend or wife,

12  spending the money he has defrauded us out of.

13       Now, he is so busy over there having fun and working

14  on real estate deals, he doesn't even come back the 26th when

15  he says he will.  He writes another e-mail and this was

16  extremely short.  And this one was written on August 29th, also

17  to the administrative staff and some medical doctors as well as

18  his employer, HealthTech.

19       August 29th.  "Hi guys.  I'm still working hard on

20  physician recruiting, finance and architectural planning

21  renovation."  We didn't see any evidence of that.  "I have

22  secured a grant for a linear accelerator for PVHC."  We didn't

23  get that.  "If we can afford the ball that goes in and the

24  startup of an advanced cancer oncology program, we're looking

25  for a radiation oncologist starting this week, and I think

1    Robin may have a lead on the oncology nurses.

2         "In a last bit of defiance I'm embarrassed to admit

3    Kim threw her mother's and my cell phone in the sink."  Your

4    Honor, it is tough to reach him by cell phone when he's in

5    Thailand, hence the lies about his phone being thrown in the

6    sink.  "Hope to have it working soon.  On that note, she

7    started a 15-day inpatient stay yesterday.  Her physician feels

8    the time to regulate the medication and depression treatment

9    will work wonders.  I hope because -- I hope -- I hope it does.

10   It has been bad this time."

11        That's the type of stuff that he absolutely had staff

12   praying for him, feeling sorry for him, granting him leave.  He

13   absolutely conned us like none I've ever been involved with.

14        It is not just that, Your Honor, I was surprised when

15   I read the transcript of his change of plea hearing.  And I

16   don't know why I should have been surprised after having done

17   the work we did.  I know he won't tell the truth.  But he was

18   before Your Honor.  He was put under oath.  You clearly

19   instructed him about the importance of being -- telling the

20   truth when he was in this courtroom under oath.

21        And he still didn't.  There are several questions

22   where he just flat was dishonest with the Court.  From little

23   things, like he was asked under oath, "So did you work through

24   the 2011 year with your employer Powell Valley Healthcare?"

25        "Yes, I did."  No, he didn't.  He was there from March

1    till September and had already stolen over $847,000.  And he

2    left because he was -- he had been caught.  He wasn't there for

3    a year.

4            He testified under oath again that he had put together

5    a company known as Plake & Associates for the purpose of

6    recruiting physicians.  We know that never happened.  Your

7    Honor asked him a question under oath:  "To the best of your

8    knowledge, did he," referring to Mr. Plake, "undertake any

9    recruiting at all through Plake & Associates?"

10           Paul Cardwell's sworn response was, "Your Honor, I did

11   significant recruiting.  He did not, Your Honor.  No, he

12   didn't."  There's no recruiting ever done through Plake &

13   Associates.  And Mr. Cardwell continues, even when he's in

14   Court trying to blame somebody else, "He didn't, but I did."

15   And yet there's no evidence that even Paul Cardwell did.  Lies

16   while under oath.

17           I don't have any confidence that he will tell the

18   truth today.  I believe that he is willing to say whatever Paul

19   Cardwell thinks will help Paul Cardwell, and that's the type of

20   person he is.

21           Finally, Your Honor, I guess I have a couple points.

22   Number one, we know that he bilked the two companies he worked

23   with out of more than $1.6 million.  We know that he was the

24   organizer.  We know that Mr. Plake was really a puppet for him.

25   We know that Paul Cardwell ended up with 75 percent of that

1    money.  You know, I heard counsel for Mr. Cardwell suggest

2    that, well, we need to treat him similar to Mr. Plake.  They're

3    not at all similar.  It was Mr. Cardwell's idea.  He formed

4    this idea to form this fake entity.  He did the fake

5    recruiting.  He directed the checks to be written.  He took

6    three-quarters of the money.  It was a Paul Cardwell scheme.

7    They're not the same.

8           I don't know how much money Paul Cardwell has left.

9    He has told Probation and Parole he doesn't have any.  He's

10   offered to pay zero dollars even though he pocketed at least

11   $1.3 million.

12          Here's what we do know, Your Honor.  When he jumped

13   bail, he went to Thailand.  He's living at a beach resort.

14   He's living a life of luxury and he's not working.  He's got

15   money.  We know that if he puts the money in the name of his

16   Thai wife-girlfriend, at least I've been told by Probation and

17   Parole, the United States can't get to it.

18          So I don't know how much money he's got, but I believe

19   whenever he gets out of jail he's going to benefit from his

20   ill-gotten gains.  And I fully believe he will tell you he

21   doesn't have any, but we know that's just not true.  He

22   couldn't have been or he wouldn't have been living the way he

23   was.

24          Your Honor, Mr. Cardwell has proven time and time

25   again that he will say whatever is in his best interests.  You

1     know, counsel has suggested that he's a different man.  I don't

2     believe there's been any switch flipped here.  I don't believe

3     anything is different, and I fully believe he will stand up and

4     say whatever he thinks is going to benefit him.

5         The staff that had such trust and reliance in him are

6     devastated.  The people that prayed for his poor ill wife and

7     family that had to be uplifted and moved out of the community,

8     they were prayed for.  And Mr. Cardwell continued to steal, lie

9     and benefit nobody but Mr. Cardwell.

10        We believe he's been treated leniently.  We ask you to

11    give him the maximum sentence you can, because whenever he gets

12    out of jail, I am convinced he's going to go have access to the

13    funds he's taken.  Thank you, Your Honor.

14        THE COURT:  Thank you.

15        MS. LESCHUCK:  Your Honor, I believe the next speaker

16    is going to be Mr. Neil Todhunter, and he's with HealthTech.

17        MR. TODHUNTER:  Good morning, Your Honor.

18        THE COURT:  Good morning.

19        MR. TODHUNTER:  My name is Neil Todhunter, N-e-i-l

20    T-o-d-h-u-n-t-e-r.  I am president of the HealthTech Management

21    Services based in Brentwood, Tennessee, on whose behalf I am

22    speaking today.  I have been president for almost two years.

23    Prior to that I served as HealthTech's regional vice-president

24    for the region that includes all of Wyoming, including Powell.

25        Both as president of HealthTech and as former regional

1    vice president I became very familiar with the circumstances

2    surrounding the hiring, tenure and termination of Paul Cardwell

3    as CEO of Powell Valley Healthcare.  Likewise, I'm very

4    familiar with the effects of Paul Cardwell's fraud, other

5    deception and other misconduct at Powell Valley.

6         We at HealthTech have been providing hospital

7    management to communities in excess of 40 years.  We have had

8    the privilege of serving and managing Powell Valley Healthcare

9    for 22 years, including by providing Powell Valley qualified

10   executive -- chief executive officers.

11        It has always been a good relationship by hiring a

12   worthy CEO for Powell Valley.  When the prior CEO announced his

13   resignation towards the end of 2010, ultimately after the

14   responsible search process, HealthTech offered Paul Cardwell

15   the position as CEO at the request of Powell Valley board of

16   directors.  HealthTech was optimistic about the hire and the

17   prospects for Cardwell's and Powell Valley's mutual success

18   because we had a lengthy tenure at the Indiana hospital with no

19   reported ethical or performance issues.

20        I know the counsel for HealthTech has submitted some

21   information to the Court regarding the extent of Paul

22   Cardwell's deception for both HealthTech and Powell Valley in

23   conjunction with the deception of Mr. Cardwell and Plake

24   Associates.

25        I am not -- I will not spend the Court's time

1  repeating any specifics of that information here today.

2  Suffice it to say, Cardwell concealed the fact that he had been

3  a long-term embezzler from the prior employer and had a

4  personal life and personal ambitions that otherwise made him

5  entirely unfit for the position of CEO at Powell Valley.  He

6  was not only, to say the least, ethically unsuitable for the

7  position, but also uninterested in actually fulfilling the

8  duties of the position.

9          This all was unbeknownst to HealthTech and Powell

10  Valley, however, because Cardwell concealed all of this when

11  applying for the position by falsely portraying who he was and

12  what his goals and aspirations were.

13          Once on the job, instead of performing the duties of

14  CEO, he apparently spent most of his time and energy doing two

15  things:  First, executing a scheme to steal close to a million

16  dollars with the collaboration of Michael Plake; second,

17  traveling to and staying in Thailand for his personal purposes

18  while lying to Powell Valley and HealthTech about where he was

19  and why.

20          Cardwell's explanations for why he was absent from his

21  post repeatedly implored HealthTech and Powell Valley to be

22  patient and understanding with him.  On one trip to Thailand he

23  concealed where he was.  Cardwell falsely claimed to be trying

24  to move his family from Indiana to Wyoming and needed much more

25  time than expected.  Being compassionate, HealthTech and Powell

1    Valley granted the request for more move time.

2           To make another getaway to Thailand, he falsely

3    claimed to have been asked to assist the hospital in an

4    accreditation survey in Japan.  Again HealthTech accommodated

5    him and granted him his request.

6           To cover up yet another trip to Thailand, Cardwell

7    falsely claimed he was in Indiana attending to his wife who he

8    falsely claimed was dealing with mental illness.  Again

9    HealthTech and Powell Valley showed him great patience and

10   compassion, allowing him to remain away from Powell Valley.

11   HealthTech's leadership was concerned for Cardwell and his

12   family and never would have guessed in a million years that

13   this was all just a horrendous lie.

14          Cardwell repaid HealthTech and Powell Valley leaders

15   with lie after lie after lie.  That is one reason why senior

16   HealthTech leaders feel victimized at a personal level by

17   Cardwell.

18          Regarding Cardwell's crimes of conviction, in

19   particular, HealthTech as a company has been victimized in

20   numerous ways.  In managing our hospitals, depending on the

21   hospital involved, we employ the CEO and/or CFO and employ

22   corporate support to the board, the organization, as well as

23   the CEO.  The hospital and HealthTech both have an obligation

24   to the communities we serve to provide competent quality

25   medical services and to represent the highest in corporate

1    integrity, honesty and trust.  These elements comprise our

2    reputations to our patients, staff and physicians in our

3    communities.  If HealthTech cannot trust the executives it

4    places in hospital facilities, it cannot maintain a viable

5    business nor can it continue to employ the dozens of people it

6    currently employs.  In short, we would be out of business.

7           Mr. Cardwell violated all of these values in the

8    embezzlement of the funds and, in turn, has damaged the

9    reputation of Powell Valley Healthcare and HealthTech.  The

10   monetary damages for Mr. Cardwell was in excess of $847,000.

11   The embezzlement not only was a major blow to the hospital's

12   balance sheet, it also caused cash shortfall in the continuous

13   operations of the hospital.

14          We are pleased that HealthTech and insurers have made

15   the hospital financially whole; however, this does not occur

16   without significant challenges for HealthTech.  HealthTech has

17   incurred hundreds of thousands of dollars in fees investigating

18   the incident and assisting in the financial recovery for Powell

19   Valley by making settlement payments to Powell Valley that were

20   not covered by insurance.  However, HealthTech has not

21   recovered the vast majority of these out-of-pocket

22   expenditures.

23          In addition, HealthTech has expended countless hours

24   of employees' time to investigate and fix the damage caused by

25   Cardwell.  Although hard to quantify, the economic value of

 1  these diverted human resources is quite significant.  This is

 2  particularly true for a company like HealthTech which, although

 3  established and blessed with wonderful clientele, is not a

 4  particularly large company.  The financial drain caused by

 5  Cardwell has a very negative impact on HealthTech's operations

 6  because it diverted important financial resources from other

 7  important company projects.

 8      Although the monetary loss to HealthTech is very

 9  large, the damage to our reputation in the communities we serve

10  as well as our national reputation of HealthTech is equally

11  large and we are still in the recovery stages.  Once a

12  reputation has been tarnished, it takes a very long time to

13  regain the trust and the integrity we once enjoyed.  I have

14  personally worked to develop financial services relationships

15  with potential clients that based upon questions they have

16  asked and comments they have made to me ultimately determined

17  not to contract with HealthTech in part because Paul Cardwell's

18  conduct and the reputational damage that that conduct caused.

19      Fortunately the board, the hospital, the incumbent CEO

20  Bill Patten Junior, the staff and the physicians at Powell

21  Valley and HealthTech have been working hard to regain the

22  trust, the positive reputations we have had the privilege to

23  enjoy in the past.  Nevertheless, the actions of Mr. Cardwell

24  have caused serious issues to Powell Valley and HealthTech, not

25  to mention White County Memorial Hospital in Indiana, and we

1    would hope that this Court would sentence Mr. Cardwell

2    commensurate with the magnitude of the damages he has caused to

3    our organizations.  Not only is such a sentence appropriate for

4    Mr. Cardwell, but only a commensurate sentence will deter

5    hospital executives across the nation from preying on those who

6    trust them to lead those facilities and to care well for the

7    people living in those communities.  Thank you, Your Honor.

8                 THE COURT:  Thank you.

9                 MS. LESCHUCK:  Your Honor, I believe the final speaker

10   is Eli Richardson, and he is counsel for HealthTech.

11                THE COURT:  Thank you.

12                MR. RICHARDSON:  Good morning, Your Honor.

13                THE COURT:  Good morning.

14                MR. RICHARDSON:  First thing I would like to do on

15   behalf of HealthTech is to thank the Court, the U.S. Probation

16   Office, the U.S. Attorney's Office for receiving our

17   information and hearing HealthTech's views regarding a couple

18   of the sentencing issues.

19                I just wanted to talk briefly to follow up on the

20   letter that the Court has alluded to here today.  The letter

21   had two purposes.  One was on behalf of the corporate victim

22   setting forth our position on a couple guidelines issues.  We

23   didn't want to be in the position where on a couple of

24   guidelines issues that we felt very strongly about, the Court

25   may ultimately make a contrary ruling to our position, and then

1   after the fact we complain about it, which would be

2   inappropriate because on the front end if we have a view, we

3   wanted the Court, the Probation office, U.S. Attorney's Office

4   to hear about it.

5         As it turns out the Court has resolved those

6   guidelines issues, and that part of the letter I think has been

7   certainly addressed by the Court here today.

8         There was a second part to my letter, and that's the

9   3553(a) factors.  And as the Court may recall in our letter,

10  our position was that, depending on where the guidelines

11  calculations ended up, a sentence within the guidelines range

12  may not be sufficient under 3553(a) to meet the sentences --

13  purposes of sentencing.

14        As it turns out, the guideline range is not an

15  insignificant guideline range here today.  But our letter

16  addressed some of the arguments that Mr. Voyles, a very

17  competent counsel, made today.  And that part of the letter

18  addresses the issue of whether the guideline range as it is is

19  adequate for the purposes of sentencing.

20        And my letter was addressing the fact that on a couple

21  of issues, we would submit the guidelines actually don't

22  account for all of the facts and circumstances of this case.

23  And to give the Court a couple of examples, for example, the

24  guidelines take account of the fact that Mr. Cardwell abused a

25  position of trust, but they don't specifically take account of

DOCKET NO. 12-CR-081-F   VICTIM IMPACT - RICHARDSON

1    the fact that they didn't have just any position of trust but

2    he was the CEO of a relatively small community hospital, very

3    important position of trust and not just any position of trust.

4         Of course the guidelines do account for the fact that

5    we are dealing with a case involving misrepresentations.  They

6    certainly account for that, but they don't really specifically

7    account for the fact that we have so many misrepresentations

8    involving Plake & Associates made to so many different people

9    at Powell Valley in ways that we submit were so egregious.

10        In addition, the guidelines take account of the fact

11   the two-level enhancement for the fact of obstruction of

12   justice based on the fact of Mr. Cardwell fleeing, but they

13   don't take into account of exactly how egregious this act of

14   fleeing was.  It wasn't just maybe leaving the state, not

15   showing up for court, maybe hiding out somewhere.  Instead, it

16   was much worse.  This involved passport fraud, traveling on

17   someone else's passport, hiding out in a foreign country with,

18   as Mr. Copenhaver alluded to, in our view, ill-gotten gains.

19        So the guidelines don't account for the kind of flight

20   that we have in this particular case, and therefore, we think

21   that contrary to some of the arguments that the Court has heard

22   from Mr. Voyles, you know, the guidelines don't necessarily

23   account for all of the facts and circumstance.  And so we

24   wanted to present them from our perspective to the Court for

25   its consideration.

1          The final point I would like to make, Your Honor,

2    relates to Mr. Cardwell's character generally.  And the Court

3    has heard some comments in court here today.  We said some

4    things in my letter regarding Mr. Cardwell's character.  And it

5    is important to note we don't do that gratuitously to bash

6    Mr. Cardwell or beat up on Mr. Cardwell, preach at him or be

7    self-righteous or whatever.

8          The point is that the characteristics of the defendant

9    are definitely a relevant sentencing factor under 3553(a) and

10   particularly in anticipation of Mr. Voyles being capable

11   counsel presenting one picture of Mr. Cardwell, certainly in

12   the best light that he can, we wanted to advise the Court of

13   some other aspects of Mr. Cardwell's character that the Court

14   may not be familiar with.

15         And we submit it does not present a good picture, it

16   just doesn't, on the issue of whether he's contrite, whether he

17   would be a recidivist, whether he is someone that should get

18   credit under 3553(a) for good character or whether, instead,

19   character is a factor that actually counts against him.

20         Based on our review of the case and, of course,

21   HealthTech and Powell Valley did a lot of investigation, we

22   don't see how character is an issue that cuts in Mr. Cardwell's

23   favor.  Instead, both his character and the nature and

24   circumstances of the offense here are so against Mr. Cardwell

25   that only a very serious sentence in our view would be

1    appropriate.

2         We really appreciate the Court's time and

3    consideration in listening to our views.  Thank you.

4         THE COURT:  Thank you, Mr. Richardson.

5         Ms. Leschuck, for the Government.

6         MS. LESCHUCK:  Thank you, Your Honor.  I guess what it

7    comes down to for the Court is what is sufficient but not

8    greater than necessary to address the factors that are in 3553.

9    And the Court has heard about those factors considerably today.

10        I think when you consider parity, I disagree with

11   Mr. Voyles that parity has to be seen in light of what happened

12   to Mr. Plake and the sentence that he received with the

13   downward departure request from the United States.

14        I think parity has to be more seen of what has gone on

15   in this district and how are people sentenced in this district

16   in similar situations.  And the highest white-collar sentence

17   that's been handed down in this district happened in August of

18   2013, and that is Bob Reed with the wind farm case.  That was

19   $4 and a half million; it was a four- or five-state fraud;

20   there were over 70 victims, most of them elderly.  And none of

21   them got their money back or when they get money back it will

22   be cents on the dollar.  And most of those people lost their

23   entire retirement savings.  That was a 151-month sentence.

24        And if you somehow swing Mr. Cardwell over and take a

25   look at where he is sitting and what he has done, he defrauded

1   two institutions which were fortunate enough to have insurance

2   and have been paid back, and now it becomes the job of

3   Mr. Cardwell to repay insurance companies in his eventual

4   restitution order.  That is a fortunate occurrence that we

5   rarely, rarely ever see in this court in terms of restitution.

6          So where do we come out?  And the recommendation of

7   the United States is in the middle of that calculated guideline

8   range.  The United States recommends 121 months.  That is about

9   four times the sentence that Mr. Plake got.  Mr. Plake, again,

10  is a big player.  I think most everyone agrees in that vein in

11  that he was sort of a facilitator more than he was an

12  organizer/leader.  And of course those enhancements added on in

13  Mr. Cardwell's sentence.

14         But if we want to achieve some sort of parity and we

15  want to look at what is appropriate under all of the

16  circumstances and the totality of what has happened, the United

17  States believes that a sentence of 121 months achieves those

18  goals.  It sets forth a deterrent effect.  And it is a sentence

19  that is appropriate.  Thank you.

20         THE COURT:  Thank you, Ms. Leschuck.

21         Mr. Voss -- Voyles, anything before we hear from

22  Mr. Cardwell?

23         MR. VOYLES:  No, Your Honor.

24         THE COURT:  All right.  Paul, if you would like to

25  step forward, I would be happy to hear your statement.

1          THE DEFENDANT:  Your Honor.  Your Honor, I realize

2     this may be the only public opportunity I have to apologize to

3     the Powell and Monticello, Indiana communities.

4          Your Honor, I was prideful, I was arrogant and I am a

5     thief.  I look at the members of the Powell community, seeing

6     him -- although I hadn't met Mr. Patten before nor had I met,

7     as far as I know, Mr. Copenhaver, but I certainly know

8     Neil Todhunter, the president of HealthTech.  And he's a good,

9     good, decent human being and a friend, I would think.

10          And I'm ashamed of my actions.  I was so self-absorbed

11    and needing money for my substantial real estate losses in

12    Thailand, I simply did not see I was causing or the trouble I

13    was causing or would cause to the Powell hospital community.

14          I have had better than two years to consider my

15    actions, including the last eight months in prison.  My

16    arrogance and pride fully convinced me I could sneak to

17    Thailand, make arrangements to send back my then 4-month-old

18    son.  The previous year I was able to send back my 4-year-old

19    daughter from Thailand, Alicia.  She remains here permanently

20    in the United States.  I wanted to do the same for Alex, my

21    son, but he remains in Thailand.

22          That decision was wrong and cowardly.  It is very

23    difficult especially at the school age for some of the children

24    in Thailand being of mixed blood, being both a farang, a

25    foreigner, and half Thai.  I was able to get the 4-year-old

1  back, but not able to get the 1-year-old back.  But that

2  decision to leave was ridiculous and cowardly.

3         My time in prison has been difficult, especially my

4  time in the Thai prison.  There were no beds, no toilets, no

5  running water, and I was the only visible American in that

6  prison.  Three meals per day of white rice and cucumber soup

7  had taken my weight down from 240 pounds to my current weight

8  of 182 pounds.  But I feel fine.  I feel fine.

9         I simply convinced myself that the money I was

10  stealing through Plake & Associates was due to me because of

11  the work I was doing.  It was not true.  The money was not

12  mine.  It was not earned, and I was stealing to get it.

13         I have lost all because of my poor decisions.  My

14  family, my friends, my employment, my home, my respect, my

15  freedom and my trust.  I simply have no one to blame but myself

16  in this matter.  I sincerely ask the citizens of Powell and

17  Wyoming and Monticello in Indiana to forgive me.

18         I am a different person from the Paul of two years.  I

19  betrayed your trust, their trust and am deeply sorry for doing

20  so.  I trust by my settlement or settling of the $3.5 million

21  dollar civil suit, more than double -- more than double what I

22  had stolen, I can begin to demonstrate my willingness to pay

23  back the money I have taken.

24         My hope is that some of my other good deeds such as my

25  volunteer work running the tent hospital during Hurricane

1    Katrina for FEMA in New Orleans, serving with the Thai Red

2    Cross at the Puket hospital following the tsunami in Thailand

3    the day after Christmas and responding in Myanmar, Burma, to

4    assist after Cyclone Nargus, along with being elected school

5    board member and Goodwill Industries volunteer of the year,

6    Special Olympics coach, high school football coach and

7    multiple-year youth football coach.

8         But none of these services excuse my theft and poor

9    decision-making skills, none of them do, at Powell and

10   Monticello.  But I wanted to be able to present a full person,

11   on one hand a thief, a liar, a pride-driven individual, coupled

12   with a long-term successful hospital CEO, a father, and a

13   community volunteer.  I want and need to support my

14   one-year-old son in Thailand, and I need to support my

15   4-year-old daughter in Indiana.  I would also like to begin

16   repaying Powell and White County Hospital as soon as possible.

17        Those causes would be best served by a balanced prison

18   sentence that takes into effect my theft and money laundering

19   with equal consideration of a previous crime-free life with

20   substantial family, work and volunteer credentials.

21        In just the short six months I've been at the

22   Scottsbluff, Nebraska detention facility, I have progressed

23   from being escorted anytime I left my cell -- whether that was

24   to recreation, whether that was to the library, to the fitness

25   area or to booking -- and as my PSI indicated from

1   Mr. Fitzgerald, am now the lead volunteer teacher for the GED

2   classes for some of those federal inmates and state inmates

3   that are trying to pass their GED, and I lead a

4   four-times-a-week Bible study program.  Not really qualified to

5   do so, but, you know, I enjoy it and the other inmates seem to

6   enjoy it and I've certainly learned quite a bit from doing

7   that, the Bible study.

8          The pride and arrogance are gone, simply gone.  The

9   time in the Thai prison and you sleep on the floor amongst 60

10  other people that are also on the floor and you use a hole in

11  the floor for your toilet and you don't have a pillow and

12  you're starving basically, and you realize the mistakes.

13         It is entirely my fault.  I'm the one that left and

14  went to Thailand.  I thought at the time I was leaving under --

15  you know, just truly didn't occur to me I was leaving under

16  anything other than good intentions to bring back my son,

17  although now I realize that was both cowardly and arrogant.

18         The pride and arrogance are gone.  Now I plan to

19  reestablish the trust I lost with my family, my friends and

20  community.  I need to pay for my crimes.  My decision to steal

21  and flee was arrogant.  Please balance the wrong I have

22  committed with the good I've accomplished in my 47 years.

23         Lastly I want to apologize again to Powell, the

24  citizens of Monticello and my family for my actions.  Thank you

25  for the opportunity to speak.

1              THE COURT:  Thank you, Mr. Cardwell.

2              Is there a recommendation for designation?

3              MR. VOYLES:  Please the Court, we would recommend the

4      Federal Correctional Facility at Terre Haute, Indiana, the

5      minimum security facility there, Your Honor.

6              THE COURT:  All right.  Well, I appreciate the

7      Comments that I've heard today.  I would like to thank all of

8      you who have traveled some distance:  Mrs. Cardwell, the

9      representatives of HealthTech and Powell.

10             Mr. Richardson, hopefully all of your travels -- all

11     of your return travels will hopefully be safe.  I think it may

12     still be snowing.

13             I know it is time out of your schedule.  You have

14     spent a considerable amount of time addressing this issue.  I

15     can appreciate Mr. Patten's comment that -- I believe it was

16     Mr. Patten's comment that people are still wondering whether

17     this will reach closure.  It has been a long time coming to

18     this point, and I'm -- and I appreciate your patience and your

19     comments through letters.

20             Thank you, Mr. Cardwell, and Mr. Voyles, for

21     collecting the letters from the community and the family.  It

22     is important to have a picture of the individual that's before

23     you, something other than the picture of the conduct that has

24     brought the individual into court.

25             This is a troubling fraudulent scheme to take so much

1   money from community hospitals that struggle to keep what they

2   see as a gem in their community up and running.  A community's

3   vitality is related to the adequate delivery of healthcare

4   services that their -- individuals who live there, the citizens

5   of Powell and Monticello, expect.  It is cold comfort to be

6   told to travel outside the community for serious health needs

7   that warrant attention at a hospital.

8        And so those small community hospitals scattered

9   around Wyoming as well as other states are significant to the

10   economic vitality of the community, the ties within the

11   community.

12        I appreciate the time and attention the board members

13   spend as volunteers.  They face their constituents every day in

14   the grocery stores, at school events.  And so when something

15   happens like this in such a small community, their claims of

16   sleepless nights and lack of trust are well believed by me.  I

17   know it has to be hard on that community, not only the board

18   members, but the staff and administration.

19        I appreciate your comment, Mr. Cardwell.  Whether your

20   intelligence and charismatic personality were corrupted by

21   greed or pride or some rationalization, it is really hard for

22   me to tell.  I appreciate your statements of apology and

23   contrite views about the events.  Hopefully that sense to

24   appear successful, and not just successful, but to be the most

25   successful or the very brightest -- hopefully that drive is and

1   will be modified over time.  The world is full of people living

2   happy, healthy lives within family in loving communities that

3   are not the brightest and most successful, and yet they have

4   their God and their family and their community that fills in

5   whatever deficits might exist.

6           In looking at a sentence sufficient but not greater

7   than necessary and considering the 3553(a) factors -- I

8   appreciate the Powell community urge to impose the longest

9   sentence authorized by law.  That sentence is 20 years.  That's

10  the maximum sentence authorized under the statute.  The

11  guideline range provides a heartland for cases in terms of a

12  guideline range sentence, and so much of the consideration is

13  does this case fall within the heartland of cases for this type

14  of conduct.

15          And it is the Court's conclusion that the guideline

16  provision does well reflect the conduct at issue, including all

17  of the enhancements.  I simply do not see a basis to vary under

18  Booker factors upward by way of seven levels to get to a

19  20-year sentence.  It exceeds the sentence mentioned by

20  Ms. Leschuck in the wind farm case, and the conduct,

21  considering all of the enhancements and the amount of loss,

22  simply in my opinion don't warrant a seven-level variance.  I

23  don't believe that that would be defensible in this case, even

24  understanding the articulated factors that were so adequately

25  and sufficiently advanced by Mr. Copenhaver and Mr. Patten.

1          That, too, denies the motion for variance considering

2     the Booker factors downward advanced by Mr. Cardwell.  I agree

3     with Ms. Leschuck that Mr. Plake isn't the best indicator of

4     sentencing for Mr. Cardwell considering all of the factors.  It

5     was apparent to the Court -- I was the one who sentenced

6     Mr. Plake.  It was a difficult sentencing.  His daughter burst

7     out in tears and ran from the courtroom hoping against the

8     sentence stated that her father would receive some probation

9     or, at a minimum, a shorter sentence that would allow her to

10    have the benefit of her father during those important high

11    school years.

12         Mr. Plake, while certainly culpable for his role in

13    the scheme, was not the individual who was most culpable in

14    putting the scheme together, seeing the need for a scheme in

15    the first place and aggressively advancing the scheme in the

16    Powell community where they ended up losing so much in such a

17    short period of time.  And so I don't see Mr. Plake as the best

18    indicator for a sentencing comparison.

19         I do, though, agree with Mr. Richardson's

20    characterization of those factors that are the most

21    distinguishing in this case:  The fact that this fraud was

22    perpetrated against two community hospitals and their -- the

23    nature of their service in the community, the nature of their

24    importance, and the fallout, if you will, the long-lasting

25    emotional and financial repercussions that can be expected from

1   a fraud perpetrated against such an entity, I think that is a

2   factor that warrants consideration.

3          The amount of deceit is another factor.  For me, it

4   was the escalation of the fraud from Indiana to Powell that

5   causes me the most concern.  I think it was stated, well

6   stated, that Mr. Cardwell perfected it in Indiana to such a

7   degree that Powell Valley was quickly defrauded, much to their,

8   I think, long-lasting detriment.  And that detriment will be

9   board members that will be reluctant to agree to serve, staff

10  members that will remain worried about their position and

11  the -- and their role vis-a-vis the board, and the leadership

12  by Mr. Patten will, in all likelihood, continue to be

13  second-guessed by the leadership within that community which

14  will affect his ability to lead and govern as a CEO.

15         And while the obstruction of justice enhancement was

16  properly imposed, this is -- this was a unique flight to avoid

17  prosecution.  I appreciated hearing Mr. Cardwell's comments

18  concerning his desire to go to Thailand to bring his young son

19  home, but that did not happen.  And only through the good work

20  of our federal and Thai counterparts are we here today at this

21  time for sentencing.

22         So with those considerations, I agree with the

23  Government in terms of the proper place for sentencing.  It is

24  not at the high end of the guidelines.  I don't think this is a

25  high-end or above-the-guideline case.  But it is in the middle

1    of the range which considers this defendant has no criminal

2    history and all of the other factors concerning the scheme and

3    implementation.

4         So with that long explanation, I will state sentence.

5         Pursuant to the Sentencing Reform Act of 1984 and

6    those factors set forth in 18 USC Section 3553(a), it is the

7    Judgment and Sentence of the Court that the Defendant Paul D.

8    Cardwell is hereby sentenced to a term of 121 months in the

9    custody of the Bureau of Prisons as to both Dockets 12-CR-81-02

10   and 13-CR-254, concurrent.

11        Upon release from custody, the defendant shall be

12   placed on supervised release to be served concurrent as to both

13   dockets for a term of three years.

14        Within 72 hours of release from the custody of the

15   Bureau of Prisons, the defendant shall report in person to the

16   probation office in the district to which he's released.

17        While on supervised release the defendant shall abide

18   by the mandatory and standard conditions of release adopted by

19   this court, with the exception that mandatory drug testing is

20   waived, and shall also comply with the following special

21   conditions.

22        The defendant shall not incur any new debt or credit

23   without the permission of the U.S. Probation Officer.  The

24   defendant shall provide full financial disclosure to the U.S.

25   Probation Officer, including detailed documentation of income

1    and expenses.  The defendant shall cooperate with the Internal

2    Revenue Service and file tax returns timely and lawfully and

3    pay any back taxes, penalties and interest as determined by the

4    Internal Revenue Service.

5           Any employment shall be subject to the prior approval

6    of the U.S. Probation Officer.

7           The defendant shall submit his person, residence,

8    storage facility, office or vehicle to a search conducted by a

9    U.S. Probation Officer at a reasonable time and in a reasonable

10   manner upon reasonable suspicion of contraband or evidence of a

11   violation of these conditions.  Failure to submit to a search

12   may be grounds for revocation, and the defendant should warn

13   all other occupants that the premises may be searched pursuant

14   to this condition.

15          The defendant shall participate in a cognitive

16   behavioral treatment regimen which may include but is not

17   limited to moral reconation therapy, cognitive thinking,

18   Thinking For A Change or interactive journalling.  The

19   defendant shall actively participate in treatment until

20   successfully discharged or until excused from the treatment

21   regimen by the probation officer.

22          The Court finds that restitution is mandatory in this

23   case and orders restitution of $1,698,664.77, due immediately,

24   inclusive of penalties and interest if applicable.

25          The Court finds the defendant does not have the

1   ability to pay a fine in addition to restitution, and no fine

2   is ordered.

3        It is ordered the defendant shall pay a special

4   assessment fee in the amount of $300 which shall be due

5   immediately.  Payments for monetary obligations shall be made

6   payable by cashier's check or money order to the Clerk of the

7   District Court, 2120 Capitol Avenue, Cheyenne, Wyoming 82001.

8        The defendant shall participate in the Inmate

9   Financial Responsibility Program to pay his monetary

10  obligations.  The defendant shall pay all financial obligations

11  immediately.  While incarcerated the defendant shall make

12  payments of at least $25 per quarter.  Any amount not paid

13  immediately or through the Inmate Financial Responsibility

14  Program shall be paid commencing 60 days following the

15  defendant's release from custody in monthly installments of not

16  less than $1,000 or 10 percent of the defendant's gross monthly

17  income, whichever is greater.  All monetary payments shall be

18  satisfied not later than 60 days prior to the defendant's --

19  the expiration of the defendant's term of supervision.

20       Pursuant to the plea agreement, the defendant has

21  waived his right to appeal.  Appeal waivers are routinely

22  enforced by the Tenth Circuit Court of Appeals.

23       The Court would recommend designation, assuming the

24  defendant's classification allows such, to Terre Haute,

25  Indiana, to facilitate visitation by family and friends.

1           Other than reasons previously argued is there any

2    reason why sentence should not be imposed as previously stated?

3           MR. VOYLES:  If it please the Court, none, Your Honor.

4           THE COURT:  Thank you, Mr. Voyles.

5           For the Government?

6           MS. LESCHUCK:  No, Your Honor.

7           I do have a motion I need to make.

8           THE COURT:  All right.  Please.

9           MS. LESCHUCK:  We would move to dismiss Counts 3

10   through 15 of the Wyoming indictment.  That's 12-CR-81-F.

11          I would like to put on the record there is the

12   potential for a 5K motion, will not be made today, as Mr.

13   Voyles indicated, but we expect that by summertime we will be

14   addressing that issue.

15          THE COURT:  Counts 3 through 15 of Case No. 12-CR-81-F

16   are dismissed as moved by the United States.

17          Sounds like we will see you back in person or at least

18   by written paper filings.

19          MR. VOYLES:  Be my pleasure to come back, Judge,

20   except in nicer weather.  It is terrible at home.

21          THE COURT:  You can't count on nicer weather, even in

22   the summer it seems.

23          Again, thank you all very much for your travel here

24   today and for your time and attention to this matter.  I

25   appreciate your written filings and your comments today.

1    Again, safe travels.

2            Is there anything else before we conclude this matter?

3            MR. VOYLES:  Nothing on behalf of the defense, Your

4    Honor.

5            MS. LESCHUCK:  Nor the United States, Your Honor.

6            THE COURT:  All right.  This concludes the sentencing

7    in Dockets 12-CR-81 and 13-CR-254.  Counsel is excused.  I will

8    remand the defendant to the custody of the Marshal.

9            I will stay on the bench as we have a sentencing at

10   11:00.

11           I will impose the sentence as stated.

12      (Proceedings concluded 10:50 a.m., January 27, 2014.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4

5              I, JANET DAVIS, Federal Official Court Reporter for

6      the United States District Court for the District of Wyoming, a

7      Registered Diplomate Reporter and Federal Certified Realtime

8      Reporter, do hereby certify that I reported by machine

9      shorthand the foregoing proceedings contained herein on the

10     aforementioned subject on the date herein set forth, and that

11     the foregoing pages constitute a full, true and correct

12     transcript.

13

14             Dated this 24th day of December, 2014.

15

16

17

18                      /s/ Janet Davis

19             _____

20                      JANET DAVIS
                    United States Court Reporter
21                  Registered Diplomate Reporter
              Federal Certified Realtime Reporter
22

23

24

25